Madden, Judge,
delivered the opinion of the Court:
We have to determine what the plaintiff should be paid, as just compensation, for three watercraft owned by him and taken from him by the Government in 1942. Two of the craft were wooden sailing ships which had been built, one in 1917 and ope in 1920, for operation as seagoing schooners. They had been, apparently, splendid ships of their kind, built in Maine yards at a cost of about $200,000 apiece. They were some 200 feet long, 40 feet wide and 22 feet deep, and had carrying capacities of about 2,200 tons.
During the 1920’s ocean traffic by sailing schooners was generally abandoned, giving way to steamships, and coastal carriage of bulk cargo was done largely by barges, towed by steam tugs, thus eliminating the uncertainties of delays due to adverse wind conditions. From that time on there was practically no market for sailing schooners as such. But the basic construction of the hull of a wooden sailing schooner was much like that of a wooden barge; hence, by removing the masts, or such of them as would not be useful as derricks for loading and unloading the barges, enlarging the hatches, and removing a part of the ’tween decks, wooden schooners such as the plaintiff’s could be made into useful barges.
Barge traffic was not heavy during the 1930’s at least until about 1939, and the two schooners here in question were not converted and were not used at all from 1934 to 1937, at which time the plaintiff bought them for a song at a United *335 States Marshal’s sale. Another schooner, not here involved, which the plaintiff bought at the same sale, he successfully-converted into a barge. But the two ships here in question, again lay idle, at anchor in a Maine harbor, until they were requisitioned by the Government in 1942. Practically nothing was done by way of keeping them in repair during these years. Their pumps were kept in working order, and they were occasionally pumped out. They stood erect, though they had, at the time of the requisition, so much water in them that they rested on the bottom of the harbor at low tide. After their requisition they were, apparently without difficulty, pumped out and towed some forty miles where they were loaded with heavy materials and sunk at the entrance to a harbor to obstruct the entry of enemy ships.
The evidence as to the value of these schooners is highly conflicting. The Navy officer who was on the lookout foi-craft suitable for block ships concluded that these were suitable, and that they were not of any value for any other purpose. We think that the second conclusion may have been induced, unconsciously, by the first. We think that his report, on which the members of the appraisal board relied heavily, was hardly fair in saying that the Glijf was “laying aground in Portland,” when in fact she was erect and afloat, and rested on the bottom only at low tide, and could have at any time been pumped and dry-docked and caulked and made seaworthy. His report on the Morey was different in that it said she was “laying in Portland harbor aground at low water.” In fact, both ships were in the same plight.
We think that these ships, at the time and in the circumstances, had a considerable potential value. The amount of labor and materials that it would have taken to build barges-such as these hulls would have made, would have been many times the value that is claimed for these ships. The Government in fact began, shortly after the requisitions, to cause-such wooden barges to be built. Although the evidence does-not show the cost of them, we are-judicially aware that, considering the then cost of labor and materials, it must have-been very large.
The plaintiff had a firm offer of some $24,000 for the Cliffy with $6,000 of hand money, from a foreign purchaser, sub *336 ject to obtaining the Government’s permission to transfer the ship to foreign registry. The United States Maritime Commission refused the permission, and the sale was not made. It is hard to understand why, if the ship was substantially worthless, the permission should have been denied. The Government offers no explanation.
The Concrete Scow, the third craft here in question, was an unusual kind of thing, a sort of orphan. She was made of concrete and iron, and was probably built during the First World War. The-plaintiff had purchased her in 1941 for $1,000 and, so far as appears from the evidence, that was all she was worth at the time of the requisition.
We have concluded that the values of the three vessels at the time and place of taking were as follows: the Zébedee E. Clif $7,500; the Maude M. Morey $6,000, and the Concrete Scow $1,000. The Government took the CTAf and the Morey on February 18, 1942. On September 25, 1944, it made its offer to pay the plaintiff $1,000 for the Clif and $700 for the Morey. The plaintiff is entitled to 4 percent interest on the $13,500 which we have found to be the value of the ships, from February 18, 1942, to September 25, 1944. From the latter date, the plaintiff is not entitled to interest on the 75 percent of the $1,700 which the plaintiff could have received, without prejudice. He is therefore entitled to 4 percent interest from September 26, 1944, to the date of judgment on $12,225 ($13,500 — $1,275).
The Concrete Scow was taken on April 4, 1942. On September 25, 1944, the Government offered to pay the plaintiff $1,000 for this vessel. We have found that that was its fair value when taken. But the plaintiff is entitled to interest at 4 percent on $1,000 from April 4,1942, to September 25,1944.
The interest herein awarded is awarded as a part of just compensation.
The plaintiff is entitled to recover $12,475, which is the $14,500 value of the three vessels less the $2,025 already paid, and interest not as interest but as a part of just compensation in the amount of $4,617.41, a total of $17,092.41. He is further entitled to recover interest at 4 percent per annum, not as *337 interest but as a part of just compensation, on $12,475 from the date of judgment herein until payment.
It is so ordered.
Howell, Judge; and LitiletoN, Judge, concur.